**UNION PACIFIC RESOURCES GROUP, INC., et al.,**
**Plaintiffs,**

v.

**RHÔNE–POULENC, INC., Defendant.**

**No. 4:98–CV–066–A.**

United States District Court,
N.D. Texas,
Fort Worth Division.

March 2, 1999.

Dennis N. Ryan, Andrews & Kurth, Dallas, TX, for plaintiffs.

Oscar Morris Harrell, Locke Liddell & Sapp, Dallas, TX, for defendant.

## MEMORANDUM OPINION
## and ORDER

McBRYDE, District Judge.

Came on for consideration the motion of defendant, Rhône–Poulenc, Inc., for summary judgment. The court, having considered the motion, the response of plaintiffs, Union Pacific Resources Group, Inc., ("UPRG") and Big Island Trona Company ("Big Island"), the reply, the record, the summary judgment evidence, and applicable authorities, finds that the motion should be granted.

## I.

### Plaintiffs' Claims

On January 23, 1998, plaintiffs filed their original complaint in this action. On February 19, 1998, they filed their first amended complaint. Plaintiffs assert claims for breach of contract conversion, negligent misrepresentation, fraud, and violations of § 10(b) of the Securities Exchange Act of 1934. Plaintiffs also plead for application of the discovery rule; that is, they assert that they could not in the exercise of due care have discovered defendant's alleged wrongdoings until 1997.

While not readily apparent from plaintiffs' amended complaint, the thrust of the complaint apparently is that defendant did not transfer enough funds from its retirement plans to successor retirement plans at the time of a stock transfer transaction by which defendant sold its indirect ownership interests in a limited partnership in which plaintiffs also had direct and indirect ownership interests. The transferred funds were for the funding of retirement benefits for the persons who worked for the limited partnership.

## II.

### Grounds of the Motion

By its motion for summary judgment, defendant maintains that plaintiffs cannot prevail on any of their claims in this action. Because the description of the grounds is rather lengthy, the court will not summarize them, but will discuss them in the context of each claim.

## III.

### Undisputed Facts

The facts underlying plaintiffs' claims are, for the most part, undisputed. The facts upon which the parties agree are as follows:

Prior to February 29, 1996, defendant owned one hundred percent of the outstanding stock of Rhône–Poulenc of Wyoming Holding Company ("Holding") and eighty percent of the outstanding common stock of Rhône–Poulenc of Wyoming Company ("RPW"). UPRG owned the remaining twenty percent of the outstanding common stock of RPW. UPRG also owned one hundred percent of the outstanding stock of Big Island. Big Island and Holding were sole general partners in Rhône–Poulenc Wyoming Limited Partnership (the "Wyoming partnership"). The Wyoming partnership existed pursuant to an amended and restated agreement of limited partnership dated December 5, 1991, as amended (the "Wyoming partnership

agreement"). Holding owned 50.49% of the Wyoming partnership and Big Island owned 48.51%. The remaining one percent was owned by RPW as the sole limited partner. In the Wyoming partnership agreement, all partners covenanted never to file a bill for a partnership accounting, except with the consent of the partnership committee.

The principal business of the Wyoming partnership was the operation of a trona mine and plant in Green River, Wyoming. Prior to February 29, 1996, the employees providing services to the Wyoming partnership ("Green River employees") participated in defendant's corporate pension plans. One plan, plan 1674, was for salaried employees; the other, plan 1679, was for hourly employees. The plans were not limited to Green River employees. Rather, employees of defendant and its other subsidiaries also participated in the same pension plans. The plans were defined benefit plans. All funds in the pension plans were held for the exclusive benefit of participants in the plans and their beneficiaries and for defraying the reasonable expenses of administering the plans.

On October 23, 1995, defendant gave a letter to Big Island confirming its intent to sell and transfer one hundred percent of its interests in Holding and RPW to OCI America, Inc. ("OCI"). On the same date, defendant forwarded to Big Island an October 20, 1995, copy of the proposed stock purchase agreement. Article 1 of the agreement governed the sale and purchase, including the price to be paid. Section 1.02 provided:

> 1.02 *Purchase Price.* The aggregate purchase price for (a) the Shares, (b) the Related Assets, and (c) the covenant of Seller contained in Section 4.11 consists of (y) U.S. $150,000,000, as such cash amount may be adjusted from time to time, both prior to and after the Closing, pursuant to Section 1.03 and (z) the assumption of the obligations to be assumed by Purchaser at the Closing pursuant to the Assignment and Assump-

tion Agreement. The purchase price shall be allocated as set forth in *Schedule 1.02.* Such allocations shall be adjusted upward or downward appropriately (in the reasonable discretion of Purchaser) with any adjustment to the purchase price provided in Section 1.03.

Def.'s App. at 00632. Section 1.03, in turn, provided, in pertinent part:

(i) The Closing Purchase Price shall be reduced by an amount equal to (i) 51% of the excess of the projected benefit obligation as defined in Financial Accounting Statement 87, attributable to Employees and Former Employees ("PBO") as of the Closing, over the ABO as of the Closing, determined in accordance with Section 8.04(c) and (ii) $1,530,000, representing the estimated present value of the cost of the obligation assumed by Purchaser pursuant to Section 8.05(b).

*Id.* Article 8 of the agreement covered employee benefits matters. Section 8.04 provided:

8.04 *Retirement Plans.* (a) Effective as of the Closing, as required by Section 8.01 hereof, Purchaser shall take all actions necessary and appropriate to cause Employees who are participants under the Rhône–Poulenc, Inc. Retirement Plan ("Plan 1674") and the Rhône–Poulenc, Inc. Basic Hourly Retirement Plan ("Plan 1679," together with Plan 1674, the *"Seller Pension Plans"*) to be eligible for participation under a defined benefit plan or plans of Purchaser or an Affiliate of Purchaser that is qualified under Section 401(a) of the Code (*"Purchaser's Pension Plan"*). Purchaser's Pension Plan or Plans shall be substantially similar to Seller Pension Plans, and shall assume the liability to provide the benefits accrued by Employees and all former Employees of Holding, RPW, the Wyoming Partnership, Overland or

any Subsidiary not actively employed by any of them as of the Closing Date (the *"Former Employees"*) under the Seller Pension Plans as of the Closing.

(b) As soon as practicable after the Closing, Seller shall cause the transfer of assets, in cash or, if mutually agreed by the parties, in kind, from the Seller Pension Plans to the Buyer Pension Plans in an amount equal to the accumulated benefit obligation, as defined in Financial Accounting Statement 87, attributable to Employees and Former Employees (*"ABO"*), determined as of the date of such transfer. Seller represents that the amount to be transferred shall not be limited by the application of Section 414(1) or 401(a)(12) of the Code.

(c) For purposes of Section 8.04(b) and Section 1.03, ABO and PBO shall be determined by Seller's actuary by applying reasonable actuarial assumptions and methods that are consistent with past practice. The calculation of these amounts shall be subject to confirmation by Purchaser's actuary. The Seller and Purchaser shall cooperate in the gathering and sharing of necessary data to be used by their respective actuaries and shall certify the accuracy of such data to such actuaries. In the event the actuaries of the parties do not agree, the determination of an independent actuary, as selected and agreed upon by the parties, shall be deemed final.

*Id.* at 00704–05.

Provisions of the Wyoming partnership agreement obligated defendant to give Big Island a first right of refusal ("FOFR") to acquire the interests defendant proposed to sell to OCI.[1] Big Island had thirty days after receipt by it of written notice of defendant's intent to sell, given pursuant to the provisions of the Wyoming partnership agreement, within which to elect to purchase the interests defendant proposed

---

1. The parties appear to be in agreement that the first right of refusal in the Wyoming partnership agreement applied to the sale by defendant to OCI of its stock ownership interests in Holding and RPW, and that the stock ownership transfers from defendant to OCI constituted a transfer of partnership interests within the meaning of the agreement.

to sell on the terms specified in OCI's purchase offer to defendant. Defendant maintained that its October 23, 1995, letter to Big Island constituted the notice that started the running of the thirty-day period. The Wyoming partnership agreement further provided that a transferee of a partnership interest would be admitted as a general partner only if all the other partners consented to such admission and the transferee satisfied the requirements regarding net worth of a corporate general partner. If the transferee was not accepted as a general partner, the partnership agreement provided that the transferor would continue to be a general partner and that the transferee would not have any authority to act for or bind the partnership, to inspect its books, or otherwise to be treated as a general partner. The agreement required consent for the transferee of a limited partnership interest to have the rights of a limited partner. A stockholder's agreement between the shareholders of RPW created a ROFR in the event one shareholder wished to sell some or all of its shares in RPW.

Even before receiving the October 23, 1995, letter from defendant, plaintiffs knew that defendant was considering the sale of its indirect interests in the Wyoming partnership. On October 6, 1995, UPRG filed Amendment No. 2 to Form S–1 with the SEC, stating that defendant was considering such a sale and outlining the options UPRG would have if defendant gave notice under the ROFR created in the Wyoming partnership agreement.

By letter dated October 25, 1995, UPRG thanked defendant for providing a copy of the proposed stock purchase agreement. The letter stated the opinion that the ROFR period had not commenced to run since OCI's offer did not provide for "a purchase price payable in cash," and because the copy of the stock purchase agreement UPRG received did not include many of the exhibits and schedules. The letter did not mention pension benefits. Def.'s App. at 00744.

By letter dated October 30, 1995, defendant responded, stating that the additional documents requested were being forwarded, and pointing out that "the purchase price is $150,000,000 in cash, subject to adjustment as specified in the agreement." *Id.* at 00746. On November 15, 1995, UPRG wrote to defendant advising that it was engaged in discussions with OCI about various partnership issues. The letter stated UPRG's position that the proposed transaction required its consent. Thereafter, UPRG and OCI exchanged drafts of proposed amendments to the Wyoming partnership agreement.

By letter dated November 27, 1995, defendant confirmed information that UPRG had determined not to exercise its rights of first refusal. By letter dated November 28, 1995, UPRG granted its consent to the proposed transaction, saying:

> Subject to the exchange of letters dated November 28, 1995, between Charles Stewart [of OCI] and me, and in view of Mr. Valla's letter of the same date to me regarding a new guaranty agreement by and among UPR, Rhône–Poulenc, Inc., and OCI America, Inc. for the $70 Million Note, UPR grants it's [sic] consent to the proposed transaction by and among OCI, OCI America, Inc., Rhône–Poulenc Chimie, S.A., and Rhône–Poulenc, Inc.

*Id.* at 00768. On November 29, 1995, defendant, OCI, and their respective parent corporations entered into the stock purchase agreement. OCI then assigned its rights as purchaser to OCI Chemical Corporation. On February 28, 1996, the parties to the stock purchase agreement and OCI Chemical Corporation amended the agreement to provide, *inter alia,* that the reduction in purchase price payable to defendant on account of § 1.03(i) of the stock purchase agreement would total $3,832,-000; interest would be paid if there was a delay in transferring funds from defendant's pension plans to OCI's pension plans; and, a certain discount rate and other actuarial assumptions would be used

in calculating ABO and PBO. The stock purchase transaction closed February 29, 1996.

On or about January 30, 1996, defendant filed with the Internal Revenue Service Forms 5310–A, notices of plan merger or consolidation, spin-off, or transfer of plan assets or liabilities, in which defendant provided notice of the transfer of assets from its pension plans to those of OCI. Attached to each form was an actuarial statement of valuation stating that the transfer was in accordance with Internal Revenue Code §§ 401(a)(12) and 414(1) and corresponding regulations. On or about March 26, 1996, defendant gave notice to the Internal Revenue Service that it had appointed a new actuary, Watson Wyatt Worldwide, and was filing new actuarial statements of valuation for plans 1674 and 1679. Watson Wyatt Worldwide issued its report on asset transfer, calculating the amount to be transferred from defendant's retirement trust to OCI's pension plans[2] as of March 28, 1996, to be $13,070,205. On or about March 29, 1996, defendant filed notices of reportable events with the Pension Benefit Guaranty Corporation reporting the transfers of pension liabilities and benefits. The PBGC has never made any statements to defendant in response to the notices. On May 15, 1996, OCI's actuaries, Coopers & Lybrand, advised that they had independently calculated the pension benefit liabilities associated with the transfers and concluded that the calculations were performed in accordance with generally accepted actuarial methods and accurately reflected the plans' formulas and agreed-upon actuarial assumptions. Except for the $13,070,205 transferred to the OCI pension plans, defendant took or withdrew no sums of money from its pension trust on account of or in connection with the sale of its stock in Holding and RPW.

## IV.

### Applicable Summary Judgment Principles

A party is entitled to summary judgment on all or any part of a claim as to which there is no genuine issue of material fact and as to which the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c) *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the initial burden of showing that there is no genuine issue of material fact. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. The movant may discharge this burden by pointing out the absence of evidence to support one or more essential elements of the non-moving party's claim "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has carried its burden under Rule 56(c), the non-moving party must do more than merely show that there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The party opposing the motion may not rest on mere allegations or denials of pleading, but must set forth specific facts showing a genuine issue for trial. *Anderson*, 477 U.S. at 248, 256, 106 S.Ct. 2505. To meet this burden, the nonmovant must "identify specific evidence in the record and articulate the 'precise manner' in which that evidence support[s] [its] claim[s]." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir.), *cert. denied*, 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994). An issue is material only if its resolution could affect the outcome of the action. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Unsupported allegations, conclusory in nature, are insuffi-

---

**2.** It is apparent that with regard to the transfer of pension plan assets, as well as in other contexts, the parties use the term "OCI" loosely, referring to different OCI-related entities as "OCI."

cient to defeat a proper motion for summary judgment. *Simmons v. Lyons*, 746 F.2d 265, 269 (5th Cir.1984).

The standard for granting a summary judgment is the same as the standard for a directed verdict. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548. If the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *Matsushita*, 475 U.S. at 597, 106 S.Ct. 1348.

### V.

*Law Applied to the Facts*

**A.** *Breach of Contract (Count One).*

Plaintiffs allege in Count One of their amended complaint that defendant breached paragraph 8.1 of the Wyoming partnership agreement requiring maintenance and availability of partnership books of account. As defendant points out, it was not a party to the agreement allegedly breached. Defendant contends that it cannot be liable for breach of contract or for attorneys' fees based thereon. Plaintiffs apparently agree, as they state that they will not pursue those claims. Br. in Supp. of Pls.' Resp. to Defs.' Mot. for Summ. J. at 49, ¶ 3.4.

**B.** *Conversion (Count Two).*

In Count Two, plaintiffs allege that defendant converted assets from the pension plans covering the Green River employees into cash and paid three million to OCI[3] and retained three million dollars. Defendant maintains that plaintiffs cannot prevail on this claim for the following reasons: (1) plaintiffs have no claim for conversion because (a) they lack title to, or a right to possession of, the assets allegedly misappropriated, and (b) no misappropriation of plan assets occurred; (2) plaintiffs' conversion claim is preempted by ERISA; (3) plaintiffs have no standing to sue under

ERISA; (4) even if plaintiffs have standing to sue, the transfer fully complied with ERISA; and (5) there is no claim for conversion of a sum of money.

 Conversion is the wrongful exercise or assumption of authority or control over another's property, thereby depriving that person or entity of possession in denial of, or inconsistent with, his or its rights. *Chrysler Credit Corp. v. Whitney Nat'l Bank*, 51 F.3d 553, 557 (5th Cir.1995); *Bandy v. First State Bank*, 835 S.W.2d 609, 622 (Tex.1992). The same general elements are required under the laws of the states of Texas, Delaware, the state whose law governed the Wyoming partnership agreement, and New York, whose law governed the stock purchase agreement. *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 446–47 (Tex.1971); *Goodrich v. E.F. Hutton Group, Inc.*, 542 A.2d 1200, 1203 (Del.Ch.1988); *Caballero v. Anselmo*, 720 F.Supp. 1088, 1098 (S.D.N.Y.1989). To prevail, a plaintiff must show legal ownership or an immediate superior right of possession and the exercise by defendant of unauthorized dominion to the exclusion of plaintiff's rights. *Caballero*, 720 F.Supp. at 1098. And, generally, there cannot be a conversion of money unless there is a claim for the return of identical money. *Goodrich*, 542 A.2d at 1203. *See Mitchell Energy Corp. v. Samson Resources Co.*, 80 F.3d 976, 984 (5th Cir. 1996); *G.D. Searle & Co. v. Medicore Communications, Inc.*, 843 F.Supp. 895, 912 (S.D.N.Y.1994).

 In this case, plaintiffs have not shown, nor have they attempted to show, that they had legal ownership or an immediate superior right of possession of the funds allegedly converted.[4] Plaintiffs contend that defendant was obligated to either deliver the funds from the pension plans themselves into the new plans or provide plaintiffs an equivalent sum directly, but

---

**3.** Plaintiffs' reference to "OCI" in Count Two presumably is to the ultimate purchaser in the stock purchase transaction.

**4.** It is undisputed that the pension funds are held in trust to be used for the benefit of the plan participants and their beneficiaries.

they cite no authority to support either contention.[5]

For the reasons discussed in the preceding paragraph, the court need not reach the ERISA issues raised with regard to the conversion count. The court does note, however, that, in their discussion of ERISA, plaintiffs admit that they are not seeking the return of specific funds, but rather seek to use the funds held by the pension plan trustees as "merely the yardstick by which to measure Plaintiffs' damages." Br. in Supp. of Pls.' Resp. at 29. Thus, plaintiffs implicitly recognize that they have no claim for conversion.[6] See Mitchell Energy Corp., 80 F.3d at 984.

## C. Negligent Misrepresentation (Count Three) and Fraud (Count Four).[7]

In Count Three of their amended complaint, plaintiffs assert a claim for negligent misrepresentation. They maintain that defendant failed to exercise reasonable care or competence in obtaining or communicating information upon which they justifiably relied. In Count Four, plaintiffs assert a cause of action for fraud. They maintain that defendant knowingly made false representations as to material facts and knowingly concealed material information with the intent of inducing plaintiffs to consent to the transaction and relinquish or sell their rights of first refusal. Although plaintiffs' amended complaint is not pleaded with particularity as required by Fed.R.Civ.P. 9(b), it appears from their summary judgment response and brief that plaintiffs are complaining in these counts that defendant did not give them enough information to enable them to make the calculations described in ¶ 1.03 of the stock purchase agreement.

Defendant says that plaintiffs cannot prevail on these claims because: (1) defendant provided all information required by the ROFRs; (2) plaintiffs failed to exercise reasonable diligence in obtaining more information; (3) plaintiffs' claims do not sound in tort; (4) plaintiffs have sued the wrong party; and (5) plaintiffs' claim for negligent misrepresentation is barred by limitations.

■ An element of both the negligent misrepresentation and fraud claims is that defendant provided false information to plaintiffs. Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc., 960 S.W.2d 41, 47 (Tex.1998); Federal Land Bank Ass'n v. Sloane, 825 S.W.2d 439, 442 (Tex.1991). Defendant maintains that there is no genuine issue of material fact to support this element. Defendant says that it furnished all information required by the ROFRs, and notes in particular that plaintiffs are not suing for breach of contract in this regard. See West Texas Transmission L.P. v. Enron Corp., 907 F.2d 1554, 1562 (5th Cir.1990), cert. denied, 499 U.S. 906, 111 S.Ct. 1105, 113 L.Ed.2d 215 (1991) (whether a right of first refusal has been violated depends upon the language of the contract at issue).

■ There is no question that defendant provided plaintiffs a copy of the proposed

---

5. Plaintiffs have not shown that defendant had any contractual obligation to transfer more than ABO to OCI. Contra Kinek v. Gulf & Western, Inc., 720 F.Supp. 275 (S.D.N.Y. 1989), aff'd, 22 F.3d 503 (2d Cir.1994); Murphy v. Heppenstall Co., 635 F.2d 233 (3d Cir. 1980), cert. denied, 454 U.S. 1142, 102 S.Ct. 999, 71 L.Ed.2d 293 (1982). The stock purchase agreement disclosed that the transfer would be based on ABO, and that is all that ERISA required. Systems Council EM–3 v. AT&T Corp., 159 F.3d 1376, 1380–81 (D.C.Cir.1998).

6. And, as defendant notes in its reply brief, to the extent plaintiffs are really seeking a partnership accounting by this claim, such accounting is foreclosed by ¶ 13.5 of the Wyoming partnership agreement.

7. Plaintiffs do not explain the nature or extent of damages they claim to have suffered by reason of the conduct they refer to as negligent misrepresentation and fraud. However, the court does not need to deal further with that omission because of the other reasons why summary judgment should be granted as to the negligent misrepresentation and fraud claims.

stock purchase agreement, which specifically provided for the purchase price adjustments. And, nowhere in the documentary evidence is there any indication that plaintiffs were actively seeking a dollar calculation of ABO and PBO. As in *Jensen*, it is plain that plaintiffs knew what they did not know; that is, they knew how the price adjustment would be calculated, but claim not to have had specific figures to make the calculation. *Jensen v. Kimble*, 1 F.3d 1073, 1078–79 (10th Cir.1993). This knowledge belies claims of fraud and negligent misrepresentation. *Cf. McCormick v. Fund American Cos.*, 26 F.3d 869, 879 (9th Cir.1994); *Jensen*, 1 F.3d at 1078–79. And, plaintiffs had a duty to do more than just make an "elliptical 'invitation' to respond" to a concern about dollar figures; they had to demand the information they needed. *Koch Indus., Inc. v. Sun Co.*, 918 F.2d 1203, 1213 (5th Cir.1990).

In attempting to create a fact issue, plaintiffs rely on the statement in an affidavit that defendant "verbally reassured Plaintiffs that there was nothing about the proposed transaction that would harm Plaintiffs." Pls.' App. tab 24, Aff. of Gilbert H. Kuhnhausen, ¶ 5. Assuming that any meaning could be made of it, this conclusory allegation is just not enough to foreclose summary judgment. Fed. R.Civ.P. 56(e); *Marshall v. East Carroll Parish Hosp. Serv. Dist.*, 134 F.3d 319, 324 (5th Cir.1998). Plaintiffs also argue that defendant, having provided partial information, had a duty to make full disclosure of all facts known to it. The cases they cite, however, merely stand for the proposition that one who has provided misleading information has a duty to correct it. *See, e.g., Foix v. Moeller*, 159 S.W. 1048 (Tex.Civ.App.—El Paso 1913, writ ref'd) (if agent lied about specific facts, the deception under which plaintiff labored was not the result of his own negligence). Plaintiffs cannot legitimately argue that they were "innocent victims who showed childlike faith in relying on misrepresentations of those who, as has been said, led them like lambs to the slaughter." *Corpus Christi Area Teachers Credit Union v. Hernandez*, 814 S.W.2d 195, 198 (Tex. App.—San Antonio 1991, no writ) (quoting *Blaine v. Lowery*, 157 S.W.2d 713, 716 (Tex.Civ.App.—Dallas 1941, no writ)). The summary judgment evidence shows plaintiffs to have been sophisticated entities who sought to gain as much as they could in return for blessing the sale to OCI. Had they been serious about exercising the ROFRs, they certainly would have aggressively pursued discussions with defendant rather than negotiations with OCI.

■ Defendant additionally argues that plaintiffs do not have valid tort causes of action, because this can only be a breach of contract case. The court agrees with defendant's analysis of *Southwestern Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493 (Tex.1991), and *Formosa Plastics*, 960 S.W.2d 41. Even the parts of *Formosa Plastics* cited by plaintiffs refer to the "legal duty not to fraudulently *procure* a contract" as being "separate and independent from the *duties established by the contract itself*." 960 F.2d at 46 (emphasis added). The only duty at stake in this action arose from the requirements of the contracts at issue.[8]

■ Defendant next argues that plaintiffs' claim for negligent misrepresentation is barred by limitations. The Fifth Circuit has declined to apply the discovery rule to such a claim. *Kansa Reinsurance Co. Ltd. v. Congressional Mortgage Corp.*, 20 F.3d 1362, 1372 (5th Cir.1994). Plaintiffs argue that state courts have applied the discovery rule to such claims. *See, e.g., Hendricks v. Thornton*, 973 S.W.2d 348 (Tex.App.—Beaumont 1998, Rule 53.7(f) mot. filed); *Heron Fin. Corp. v. United States Testing Co.*, 926 S.W.2d 329 (Tex.App.—Austin 1996, writ denied). The discovery rule applies only where (1) the nature of the injury is inherently undiscoverable and (2) the evidence of injury

---

8. There is not a claim for tortious interference being made.

is objectively verifiable. *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455–56 (Tex.1996). An injury is inherently undiscoverable if it is by nature unlikely to be discovered within the prescribed limitations period despite due diligence. *Hendricks*, 973 S.W.2d at 365. Such is not the case here, where plaintiffs had the formula for calculating the price reduction, knew that ABO would be used the calculate the pension funds to be transferred, and failed to exercise due diligence at the time the ROFRs were in effect to demand information necessary to make the calculations. Thus, the discovery rule does not apply and plaintiffs' negligent misrepresentation claim is untimely.

Finally, as to these claims, defendant contends that plaintiffs have sued the wrong party. Plaintiffs explain in their response that they seek no damages from OCI.[9] Defendant offers no reply. The court cannot find that OCI is an indispensable party.

### D. Securities Fraud (Count Five).[10]

In Count Five, plaintiffs allege that defendant violated 10(b) of the Securities Act of 1934 and rules and regulations thereunder in inducing plaintiffs not to exercise their ROFRs. Specifically, plaintiffs allege that: (i) defendant omitted to disclose that the effect of implementation of the stock purchase agreement would be defendant's appropriation of assets contributed by plaintiffs to the pension plans; (ii) defendant represented that the pension plans would be substantially similar to defendant's pension plan, which was untrue; (iii) defendant omitted to disclose that its appropriation of assets would cause the successor pension plans to be underfunded;

and, (iv) defendant never disclosed the amount of the purchase price adjustment described in ¶ 1.03 of the stock purchase agreement. Pls.' First Am.Compl. at 11–12.

Defendant maintains that plaintiffs have no claim for securities fraud because: (1) the ROFR under the Wyoming partnership agreement was not a security; (2) plaintiffs were not purchasers or sellers of a security; and (3) plaintiffs failed to exercise due diligence. Defendant also alleges that, in any event, any securities fraud claim is barred by limitations.

▪▪▪▪ Although a right of first refusal may be a security, it is not one in the hands of a general partner. *Frazier v. Manson*, 651 F.2d 1078, 1080–81 (5th Cir. Unit A July 1981); *Lawrence v. Cohn*, 932 F.Supp. 564, 578 (S.D.N.Y.1996). And, there is no evidence of a sale or purchase, even assuming the ROFR was a security. Rather, the ROFR simply expired, an event akin to the failure to sell or purchase described in *Blue Chip Stamps* as not giving rise to a cause of action for federal securities fraud. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 737–38, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).[11]

### VI.

### ORDER

For the reasons discussed herein,

The court ORDERS that defendant's motion for summary judgment be, and is hereby, granted; that plaintiffs take nothing on their claims against defendant; and, that such claims be, and are hereby, dismissed with prejudice.

---

**9.** Plaintiffs erroneously contend that defendant could not have sold its partnership interest without first obtaining their consent. Although this may be true as a practical matter, it is not legally correct.

**10.** Again, plaintiffs fail to define the nature and extent of damages they claim to have suffered by reason of the conduct they say violates § 10(b) of the Securities Act of 1934

and the rules and regulations thereunder. Because plaintiffs so clearly do not have any Securities Act cause of action, the court is not concerning itself further with that inadequacy.

**11.** The court does not reach the due diligence or limitations issues related to the securities fraud claims.

*FINAL JUDGMENT*

In accordance with the court's memorandum opinion and order of even date herewith,

The court ORDERS, ADJUDGES, and DECREES that plaintiffs, Union Pacific Resources Group, Inc., and Big Island Trona Company, take nothing on their claims against defendant, Rhône–Poulenc, Inc., and that such claims be, and are hereby, dismissed with prejudice.

The court further ORDERS, ADJUDGES, and DECREES that defendant have and recover its court costs from plaintiffs, jointly and severally.